**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fulfillment Services, Inc., ) | |
|           Plaintiff, ) | CV 05-538 TUC DCB |
| vs. ) | |
| United Parcel Service, Inc., ) | |
|           Defendant. ) | **ORDER** |

For the reasons explained below, Defendants' Motion to Dismiss and Request for Judicial Notice are granted.

**The Complaint**

Plaintiff, Fulfillment Services, Inc. (Fulfillment), filed this case as a class action on September 7, 2005. The action has not yet been certified as a class action. Fed. R. Civ. P.23(c).

Fulfillment alleges that Defendant, United Parcel Service (UPS), violated 49 U.S.C. § 13703, a provision of the Motor Carrier Act that provides an exemption from antitrust laws for certain collective activities.

In order to be free from antitrust laws which prohibit carriers from entering into agreements with one another to bill the same amounts for the same services, carriers must comply with the provisions for the exemption. The agreement may establish: "through routes and joint rates; rates for the transportation of household goods; classifications; mileage guides; rules; divisions; rate adjustments of general application based on industry average carrier costs . . . ; or procedures for joint consideration, initiation, or establishment of matters described as allowed in the agreement." 49 U.S.C. § 13703(a)(1). The agreement entered into by the carriers may be submitted to the Surface Transportation Board for approval and may be

approved by the board if the agreement is in the public interest. 49 U.S.C. § 13703(a)(2). If approved by the board, it may be made and carried out under its terms and under the conditions required by the Board, and the antitrust laws do not apply to the parties and other persons with respect to making or carrying out the agreement. 49 U.S.C. § 13703(a)(6).

Subsection f provides: that motor carriers "whose routes, rates, classifications, mileage guides, rules or packaging are determined or governed by publications established under agreements approved under this section *must participate in the determining or governing publication for such provisions to apply*." (emphasis added).

Plaintiff alleges that Defendant charged rates based upon collectively established classifications without being a participant in the publication of those classifications. In other words, UPS violated 49 U.S.C. § 13703(f).

Specifically, Fulfillment alleges that the National Motor Freight Classification (NMFC) 100 Series is the publication in which the participating motor carriers establish their collectively-made freight classifications, which has operated under the antitrust immunity provision of the statute since 1956. UPS introduced its Hundredweight Service in 1988, and participated in the NMFC and used the published classification rating system. "Item 2000 of UPS's General Tariff stated that 'Hundredweight Service may be selected by a shipper for a shipment of freight classes 50-125.'" (Complaint at 4.) Fulfillment explains, "[a]ll commodities moving by truck transportation have a 'classification rating' by the NMFC, ranging from class 50 through class 500. These ratings are based on the transportation characteristic of an article, with density usually the primary transportation factor, class 50 being assigned to the heaviest density commodities, such as lead ingots, and class 500 to the lightest density commodities, such as ping pong balls." *Id.*

UPS terminated its participation in NMFC sometime in 2000, but allegedly continued to refer its shippers to the NMFC classification for class ratings of their commodities to determine if they qualified for the Hundredweight Service Rates. July 14, 2004, UPS removed the reference to NMFC classes 50-125 from Item 2000 in its General Tariff.

Fulfillment files the case as a class action on behalf of all shippers who moved freight with UPS pursuant to Item 2000 of UPS's General Tariff from 2000 to 2004. Fulfillment asks the Court to enter declaratory judgment that the UPS tariff became void when it withdrew from participation in NMFC in 2000. Fulfillment argues that UPS was unjustly enriched by collecting freight charges pursuant to the void tariff. Fulfillment seeks restitution or disgorgement of UPS's unlawful gains of all amounts collected pursuant to the void tariff, pursuant to 49 U.S.C. § 13103 (damages under the Motor Carrier Act are in addition to remedies existing under another law or common law). (Complaint at Count I.)

Alternatively, Fulfillment seeks damages pursuant to 49 U.S.C. § 14704(a)(2) for the difference between the freight charges due under UPS's last legally applicable rate prior to its withdrawal from participation in the governing publication and the unauthorized freight rates actually charged by UPS. (Complaint at Count II.)

**49 U.S.C. § 14704(a)(2)**

This Court's subject matter jurisdiction hinges on provisions in 49 U.S.C. § 14704(a) that create a private cause of action for violations of the Interstate Commerce Act (ICA), Motor Carrier provisions. Here, Fulfillment alleges the Defendant violated 49 U.S.C. § 13703(f). The question is whether or not there is a private cause of action for such a violation.

The seminal case considering private causes of action pursuant to 49 U.S.C. § 14704(a)(2) is *Owner-Operator Driver's Ass'n v. New Prime, Inc.,* 192 F.3d 778 (8th Cir. 1999). Owner-operators brought suit against motor carriers because the lease agreements used by the motor carriers violated Truth-in-Leasing regulations. The court held that a private right of action exists under 49 U.S.C. § 14704(a)(1) to bring a civil action for injunctive relief for violations of sections of the Motor Carrier Act dealing specifically with motor carrier leasing, and to sue for damages under § 14704(a)(2), which provides that a carrier is liable for damages sustained by a person as a result of an act or omission of a carrier in violation of the Motor Carrier Act.

The 8th Circuit considered the ICC Termination Act of 1995 (ICCTA), which eliminated the Interstate Commerce Commission (ICC) as the agency responsible for the comprehensive

regulation and licensing of motor carriers. "Congress intended that the Termination Act substantially deregulate rail and motor carrier transportation." *Id.* at 781. Congress expressly addressed the administrative system provided by the ICC for dispute resolution. It did not believe that the Department of Transportation (DOT) should allocate scarce resources to resolving what are essentially private contract disputes and specifically directed that DOT should not continue the dispute resolution functions established by the ICC. *Id.* (citing H.R.Rep. No. 104-311, at 87-88 (1995), *reprinted in* 1995-2 U.S.C.C.A.N. 793, 799-800).

The bill provided for private parties to bring actions in court to enforce provisions of the Motor Carrier Act . . . to "permit these private, commercial disputes to be resolved the way that all other commercial disputes are resolved--by the parties." *Id.* "Consistent with this explanation, the Committee described § 14704 of the House Bill as 'provid[ing] for private enforcement of the provisions of the Motor Carrier Act in court. This expands the current law which only permits complaints brought under the Act to be brought before the ICC.'" *Id.* (citing H.R.Rep. No. 104-311, at 120-121; 1995-2 U.S.C.C.A.N. at 832-33).

In *New Prime*, the owner-operators sought to enforce Truth-in Leasing regulations in court, and the motor carriers argued for the prior regimen of exclusive administrative remedies. The court held that the Secretary of the Federal Highway Administration (FHWA) did not have exclusive jurisdiction to resolve private disputes over the Truth-in-Leasing regulations. *Id.* at 783 (*comparing,* 49 U.S.C. § 14701(b) (person may file a complaint with the Secretary or Board about a violation by a carrier of this part) with 49 U.S.C. § 14704(a)(2) (a carrier is liable for damages sustained by a person as a result of an act or omission of that carrier or broker)).

The court analyzed the same provisions of § 14704(a) at issue in this case and spoke definitively. The first sentence in § 14704(a)(1) authorizes private suits to enforce FHWA orders, not agency regulations. *Id.* at 783. The second sentence in section (a)(1) provides that a private party "may bring a civil action for injunctive relief for violations of § 14102, motor carrier leasing, and § 14103, loading agreements. Though this sentence refers only to statutory violations, it must also include violations of implementing regulations because the statute contains no mandates or prohibitions, but simply authorizes the Secretary to adopt leasing

1 requirements. It would be impossible for a carrier to violate the statute other than by violating
2 rules or regulations promulgated under the statute. *Id.* at 784. The court allowed the owner-
3 operators' claims for injunctive relief against the carriers for regulatory violations.

4 Important to the case before this Court, the eighth circuit appellate court also allowed
5 the owner-operators' damage claims pursuant to § 14704(a)(2), which provides that "[a] carrier
6 ... is liable for damages sustained by a person as a result of an act or omission of that carrier ...
7 in violation of this part." The court explained that subsection (a)(2) is a separate part of §
8 14704(a). *Id.* at 784. Confessing "to being rather mystified by the inconsistent language used
9 in the Termination Act's various enforcement provisions . . .," the court, nevertheless, held that
10 "the most logical reading of the language of § 14704(a)(2) is that it authorizes private parties
11 to sue for damages for carrier conduct" in violation of the Motor Carrier Act. *Id.* "And that
12 interpretation is certainly reinforced by the legislative history of § 14704(a)(2)." *Id.* (referring
13 to H.R. Conf. Rep. No. 104-422 at 221-22, *reprinted in* 1995-2 U.S.C.C.A.N. at 906-07 (stating
14 that § 14704(a)(2) "provides for private enforcement of the provisions of the Motor Carrier Act
15 in court.... The ability to seek injunctive relief for motor carrier leasing ... violations is in
16 addition to and does not in any way preclude the right to bring civil actions for damages for
17 such violations.") "In construing this inconsistently drafted statute, it is appropriate to use its
18 legislative history to confirm the most plausible construction of a subsection's plain language."
19 *Id.* (citing *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 610 n. 4 (1991)).

20 The inconsistency noted by the eighth circuit court is between subsection 1, which
21 specifies a private right of action to sue for injunctive relief, and subsection 2, which only
22 provides for damages sustained by a person as a result of an action or omission of the carrier.
23 Nevertheless, the court concluded that 49 U.S.C. § 14704(a) authorizes both private actions for
24 injunctive relief and damages to remedy *at least some* violations of the Motor Carrier Act and
25 its implementing regulations. *Id.*

26 In a recent case, *Rivas v. Rail Delivery Service, Inc.*, 423 F.3d 1079, 1083-1085 (9th Cir.
27 2005), the Ninth Circuit Court of Appeals accepted the reasoning of the eighth circuit in *New*
28 *Prime*, that the private right of action under § 14704(a) allows damage claims under subsection

- 5 -

1  (a)(2) and explained that this alters motor carriers' substantive rights by expanding the class of plaintiffs eligible to bring claims against them and, therefore, § 14704(a) may not be applied retroactively to agreements or conduct completed before the effective date of the ICCTA. *Id.*

Under § 14704(a)(2), Fulfillment has standing to bring a private cause of action against UPS if it was damaged as a result of the challenged act or omission by UPS. Here, Fulfillment challenges UPS's failure to participate in the NMFC publication in violation of 49 U.S.C. § 13703(f), which requires such participation in order to be excepted from anti-trust laws that prohibit motor carriers from collectively establishing freight classifications and rates. The Court must determine whether 49 U.S.C. § 14704(a)(2) provides a private cause of action to seek damages related to UPS's alleged noncompliance with 49 U.S.C. § 13703(f): failure to participate in the governing publication establishing the collective agreement classifications 50-125.

**Motion to Dismiss**

UPS characterizes Fulfillment's case as a tariff challenge based on a "void for nonparticipation" argument. UPS explains that the "void for nonparticipation rule" no longer applies because Congress eliminated the requirement that motor carriers file their tariffs with the ICC, and declared any and all filed tariffs null and void. 49 U.S.C. 13210(a)(4); TIRRA, Pub. L. No. 103-311, 206(c), 212, 108 Stat. 1683, 1684, 1690, (effective August 26, 1994). The "void for non participation rule" pertained to the "filed rate doctrine" which in the filed tariff era forced consumers to pay the filed tariff rate, regardless of other agreements or arrangements between the parties for lesser rates, unless the tariff was void for nonparticipation.[1] Since deregulation, motor carriers are no longer required to file tariffs with the government, tariffs are not subject to being declared void for irregularities as they were in the tariff-era.

---

[1]For example, in the filed-rate era, undercharge actions could be brought, usually by a trustee of a bankrupt trucking company, to enforce a filed tariff rate that was higher than a rate agreed to and charged by the trucking company. The courts refused to enforce the higher filed-tariff rate if the tariff was void for some technicality like the one asserted by Plaintiff in this action. As an equitable exception to the the filed rate doctrine, carriers were not allowed to enforce improperly filed (void) tariffs.

This Court, like both parties, recognizes that "tariffs continue to be the standard industry practice and the medium by which carriers publish their rates, classifications, rules and practices." (Reply at 4 (citing Opposition at 11-12)). The fact that carriers label their contract documents "'tariffs out of habit," *Tempel Steel Corp. v. Landstar Inway, Inc*. 211 F.3d 1029, 1030 (7th Cir. 2000), does not impart any special status nor make such contracts so labeled subject to the limited statutory or regulatory tariff requirements. Tariffs must still be filed for two transportation services not at issue in this case: transportation in noncontiguous domestic trade and movement of household goods. 49 U.S.C. § 13702. It is undisputed that there was no filing requirement for the UPS General Tariff at issue here.

Consequently, within the context of deregulation, the term "void" means that 49 U.S.C. § 13703(f) "forbids" motor carriers to apply collectively established freight classifications unless they participate in the governing publication for such classifications. (Objection at 1.) It is undisputed that UPS did not participate in the NMFC publication for freight classifications after 2000. Consequently, Plaintiff argues that UPS's General Tariff is void because Item 2000 improperly referenced the NMFC published freight classifications 50-125 from 2000 to 2004.

Without objection, the Court takes judicial notice of UPS's General Tariffs, effective February 7, 2000, through July 12, 2004. The tariff documents reflect that in 2000, UPS erroneously reported in Item 400 that NMFC was a governing publication and Item 2000 included reference to the challenged NMFC classifications 50-125. (Request for Judicial Notice at Ex. A.) The UPS General Tariff, effective May 31, 2000, was the same. *Id.* at C. UPS corrected the error in its General Tariff, effective June 21, 2000, by omitting the NMFC as a governing publication in Item 400, but the reference to the NMFC classes 50-125 remained in Item 2000 until UPS issued its General Tariff, effective January 5, 2004. *Id.* at D, E, G-H, J-K, M.

Here, the challenged impropriety is an agreement made pursuant 49 U.S.C. § 13703.

**49 U.S.C. § 13703**

Beginning in 1941, the Department of Justice began questioning the cooperative activities of the railroads carried on through rate bureaus until confusion, uncertainties and

inconsistencies became matters of national concern. *Atchison, Topeka & Santa Fe Ry. Co. v. United States,* 597 F.2d 593, 594 (7th Cir. 1979). "'Congress was faced with the duty of harmonizing and reconciling the policy of the antitrust laws as applicable to common carriers with the national transportation policy which seeks the maintenance of a transportation system which provides service to the public with reasonable charges and without unjust discrimination or unfair or destructive competitive practices. A large measure of cooperation and collective action by and among common carriers is necessary if the national transportation (policy) is to be effectuated and the public is to receive the kind of transportation service to which it is entitled and if the rates are to be reasonable and nondiscriminatory.'" *Id.* (quoting Senate Report, S.Rep.No. 94-499, 94th Cong., 1st Sess. 14 (1975), U.S.Code Cong. & Admin.News 1976, pp. 14, 28.)

In 1948, Congress added the Reed-Bulwinkle Act to the Interstate Commerce Act to harmonize and reconcile the antitrust laws as applicable to common carriers, with the national transportation policy so as to protect the public interest. *Id.* (quoting S. Rep. No. 44, 80th Cong., 1st Sess. 3 (1947), see also H.Rep. No. 1100, 80th Cong., 1st Sess. 4 (1947), U.S. Code Cong. Serv. 1948, p. 1844).

It is necessary to strictly construe immunity of collective rate-making activities from antitrust laws and to consider the ways in which Congress has accommodated the sometimes conflicting interests of the antitrust laws and the Interstate Commerce Act. *Square D. Company v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 411, 421 (1986) (citing *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 217-218 (1966) (exemptions from antitrust laws are strictly construed and strongly disfavored)). So while joint setting of rates pursuant to agreement is exempted from the antitrust laws, the statute strictly limits the exemption to actions that conform to the terms of the agreement approved by the ICC. *Id.* at 414. The ICC's approval, "in effect, establishe[s] the lawfulness of the [] rates. *Id.* at 416. "'What rates are legal is determined by the Act to Regulate Commerce," *id.,* which here is 49 U.S.C. § 13703.

Assuming UPS violated 49 U.S.C. § 13703(f) by referencing the NMFC classifications without participating in the NMFC publication, UPS may not enforce collection of mileage

rates adopted pursuant to the collectively made agreement. 49 U.S.C. § 13703(f)(2)(A) (participation in governing publication is required for enforcement action). UPS is not exempt from antitrust law, 49 U.S.C. § 13703(f)(1)(B)(i) (provisions for antitrust exemptions do not apply), and UPS may be prosecuted by the government, 15 U.S.C. § 9, or sued by an individual for antitrust violations, 15 U.S.C. 15(a).

The Clayton Act provides: "any person injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore." 15 U.S.C. § 15(a). This allows private persons to sue for antitrust violations. *Glen Holly Entertainment, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1007 (9th Cir. 2003).

"Antitrust injury is defined not merely as injury caused by an antitrust violation, but more restrictively as 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.* at 1007-08 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977)). In other words, " . . . a plaintiff must prove that his loss flows from an *anticompetitive* aspect of the defendant's behavior···· If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal *per se.*" *Id.* at 1008 (quoting *Pool Water Products v. Olin Corp.,* 258 F.3d 1024, 1034 (9th Cir. 2001) (citation and internal quotation marks omitted).[2]

Antitrust laws "were enacted for 'the protection of competition, not competitors.' " *Id.* 1008 (quoting *Cargill, Inc. v. Monfort of Colorado*, 479 U.S. 104, 115 *1886) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 488 (1977) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962)). "The end sought [by the Sherman Act's prohibition against unreasonable restraints of trade] was the prevention of restraints to free competition in

---

[2]Antitrust injury is made up of four elements: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent. Additionally, the injured party must be a participant in the same market as the alleged malefactors, such as a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market. *Id.* (citations omitted).

- 9 -

business and commercial transactions which tended to restrict production, raise prices *or otherwise control the market to the detriment of purchasers or consumers of goods and services,* all of which had come to be regarded as a special form of public injury." *Id.* at 1009-1010 (*Apex Hosiery Co. v. Leader,* 310 U.S. 469, 493 (1940) (emphasis in *Glen Holly*). "'[T]he central purpose of the antitrust laws, state and federal, is to preserve competition. It is competition ⋯ that these statutes recognize as vital to the public interest.'" *Id.* at 1010 (quoting *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 988 (9th Cir.2000)). "Every precedent in the field makes clear that the interaction of competitive forces ⋯ is what will benefit consumers.'"

Congress struck a delicate balance when it adopted § 13703, excepting certain agreements from antitrust liability. The agreement requirements contained in § 13703, including those allegedly violated by the UPS, are not tariff filing requirements. They serve the purpose of the statute, which is to provide an exemption from antitrust liability for agreements that comply with the very specific provisions of the statute for securing such an exemption. Imposing further liability, as Fulfillment suggests exists under § 14704(a)(2), goes beyond the narrow purpose of § 13703, constrains contractual freedom, and is contrary to the policies and principles behind deregulation. This Court finds that liability under § 13703 does not extend beyond antitrust violations.

"Any carrier which is a party to an agreement under paragraph (1) is not, and may not be, precluded from independently establishing its own rates, classification, and mileages or from adopting and using a non-collectively made classification or mileage guide." 49 U.S.C. § 13703(a)(4).

The Surface Transportation Board has jurisdiction under § 13703(a)(5)(B) to investigate any action taken pursuant to an agreement and to take such measures as may be necessary to protect the public interest including issuing an order directing the parties to cease and desist or to modify the action. The Board may bring a civil action to enforce the provisions of § 13703. 14702. The Board may review an agreement and change the conditions of approval or terminate

it when necessary   An action approving an agreement, denying, ending or changing an approval has effect only as related to application of the antitrust laws.   49 U.S.C. § 13703(c).

In § 14704, Congress limited under the first sentence of (a)(1) to enforcement of Board Orders that are not for the payment of money, which includes any Order of the Board directed at enforcement of § 13703(f) provisions like the one challenged here.   The second sentence of (a)(1) to injunctive relief for violations of § 14102 (leasing agreements) and § 14103 (loading arrangements).

Subsection b limits liability for damages for exceeding tariff rates to the two classes of tariffs that must still be filed with the government: tariffs required under § 13702 for household goods and noncontiguous domestic trade.   The Court notes that for such tariff violations, "a carrier is liable for the amounts charged that exceed the applicable rate for transportation or service contained in a tariff in effect."   49 U.S.C. § 14704(b).   This is the same damage calculation proposed by the Fulfillment: the difference between the freight charges due under UPS's last legally applicable rate prior to the alleged violation of § 13703(f) as compared to the unauthorized rate charged by UPS after the alleged violation: UPS stopped participating in the NMFC publication.

Subsection (c) provisions for filing a complaint with the Board or for bringing a civil action to recover damages exceeding a tariff rate are limited to subsection b.

The limitations in § 14704 would be pointless if the courts overrode them by interpreting § 14704(a)(2) to provide private causes of action for every kind of violation of the Motor Carrier Act.   Like the court in *New Prime*, this Court looks to the purpose of deregulation, which was to provide a private forum to resolve what are essentially private contract disputes.  *New Prime*, 192 F.3d at 781.   This case does not involve such a dispute.   Here, Fulfillment challenges the legality of UPS's reference to a collective agreement.

The court rejects Fulfillment's argument that UPS's procedural error of failing to participate in the NMFC governing publication subjects it to a claim for restitution damages for

- 11 -

UPS's unjust enrichment or compensatory damages for Fulfillment's actual monetary loss. (49 U.S.C. § 13103; 49 U.S.C. § 14704(a)(2)).

As noted by the court in *New Prime*, 49 U.S.C. § 14704(a)(2) authorizes damages to remedy *at least some* violations of the Motor Carrier Act, but this Court finds that it does not provide a private cause of action for damages for every and any kind of violation of the Motor Carrier Act. It does not provide a private cause of action for a violation of 49 U.S.C. § 13703(f).

Plaintiff cannot rely on 49 U.S.C. § 13103, which provides that "[e]xcept as provided in this part, the remedies provided under this part are in addition to remedies existing under another law or common law." This is a saving clause of preexisting rights under other laws or common law. *Pennsylvania R. Co. v. Sonman Shaft Coal Co.*, 242 U.S. 120, 123 91916) (purpose is to preserve all existing rights not inconsistent with those which the ICA creates). It does not provide a private right of action for Plaintiff to sue for damages resulting from alleged violations of 49 U.S.C. § 13703(f).

The Court does not reach the merits of the other arguments raised by the Defendant in its Motion to Dismiss.

**Accordingly,**

**IT IS ORDERED** that Defendant's Motion to Dismiss (document 18) is GRANTED.

**IT IS FURTHER ORDERED** that Defendant's Motion Requesting Judicial Notice in Support of the Motion to Dismiss (document 19) is GRANTED.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter Judgment accordingly.

DATED this 19th day of April, 2006.

David C. Bury
United States District Judge